**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

00 MAR -6 PM 3:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHN PATRICK JORDAN,           )
                               )
        Plaintiff,             )
                               )
vs.                            ) Civil Action No. CV-93-S-0490-NE
                               )
TIM MORGAN, in his individual  )
and official capacity;         )
KEN TAYLOR, in his individual  )
capacity; and JOE PATTERSON, in )  **ENTERED**
his individual                 )
capacity,                      )  MAR -6 2000
                               )
        Defendants.            )

## MEMORANDUM OPINION

Plaintiff, John Patrick Jordan, was employed as a criminal

investigator in the Madison County, Alabama District Attorney's

office for less than six months. His employment was terminated on

January 25, 1993, approximately one week after defendant Tim

Morgan, the newly elected District Attorney, assumed the duties of

his office. In plaintiff's third amended complaint, he alleges

that Morgan fired him in violation of rights secured by the First

and Fourteenth Amendments of the United States Constitution. He

also alleges that Morgan, together with defendant Ken Taylor, a

former Assistant District Attorney, and defendant Joe Patterson,

the former Sheriff of Madison County, Alabama, conspired, in

violation of 42 U.S.C. § 1985, to prevent him from supporting the

incumbent District Attorney who was defeated by Morgan during the 1992 general election.

The action is before this court on defendants' motion for summary judgment (doc. no. 67), and plaintiff's motion to correct the order entered on December 7, 1998 (doc. no. 83). For the reasons set forth below, the court finds that defendants' motion is due to be granted in part and denied in part, and plaintiff's motion is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or

2

"pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or

3

conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II.  FACTUAL BACKGROUND

Plaintiff is of African-American heritage. He began his law enforcement career in August of 1989, when he was hired by Joe Patterson ("Patterson"), who then was Sheriff of Madison County,

4

Alabama, to work as a guard in the Madison County Jail. In a very short time, however, Patterson promoted plaintiff to the position of deputy sheriff, and he served in that capacity until July of 1992, when the events leading to this suit began to occur.

In either late June or early July of 1992, plaintiff noticed a job announcement posted in the Madison County Personnel Office, soliciting applications for a criminal investigator position in the District Attorney's office. He submitted a job interest card to the personnel department. He also asked Gail Medley ("Medley"), the personnel director, whether he should submit a formal application for the position. Medley replied that would not be necessary, "because they already had my application on file as a deputy sheriff. She said that I might need to attach a resume...."[1]    Medley also advised plaintiff that, if he were selected, he "would be transferred from the Sheriff's Department to the district attorney's office and [he] would not lose benefits or ... time" in service.[2]

Following an interview in the District Attorney's office, plaintiff was offered the investigator position. Morris Brooks

---

[1] Plaintiff's deposition at 30.

[2] *Id.* at 29. This conversation, which Medley incidentally did not recall having (*see* Medley affidavit ¶ 3), relates to plaintiff's procedural due process claim discussed *infra*.

5

("Brooks") then was the incumbent District Attorney of Madison County. He had been appointed to the position by the Governor of Alabama, to complete the balance of the term of former District Attorney Robert E. Cramer, who had been elected to Congress during the 1990 general election. Brooks was a Republican, and in 1992 he was involved in a general election contest with Tim Morgan, the Democratic nominee, for election to a full six-year term of office.

Plaintiff notified Sheriff Patterson of his decision to accept the District Attorney's offer on July 13, 1992, by submitting the following letter of resignation:

> One of the proudest days of my adult life was to be highered [sic] at the Madison County Sheriff's Department. Under the leadership of Joe W. Patterson.
>
> Resently [sic] another employment opportunity was presented to me in the District Attorney's office as an Investigator one position. I applied for the position and was excepted [sic]. Therefore, I am submitting my two week notice of resignation to your administration starting 7-13-92.
>
> I will continue to support Joe Patterson's administration and I look forward to working with Chief Charlie Normen's administration. [3]

Plaintiff also walked to Patterson's office, to personally inform the Sheriff of his decision. Patterson discouraged him.

> He told me that, "I can't believe that you blacks would support a republican and a Mormon. They hate you people."
> . . .

---

[3] Plaintiff's affidavit, exhibit C.

6

> He also said that if I were to take the job with Morris Brooks, that if and when Tim Morgan go in office, that he guarantees that I would not work for him a day, that he would have me fired.
>
> . . .
>
> He offered me a job as an investigator with his department, and I told him that I was already committed to the district attorney's office, that I was going to be transferred up there. ... An he said, "Well, when you go, you won't have a job long." He said, "He's going to fire you. I guarantee you he's going to fire you. He's not going to keep anybody that supports Brooks."
>
> . . .
>
> He asked me — well, he told me that I should be out campaigning for Morgan, that Morgan was a democrat and he supports blacks and that I ought to be out telling people the type of racist that Brooks really is. And he asked me if I knew anything about Mormans, and I told him no. And he said, "Well, they hate black people. You know that, don't you?"
>
> . . .
>
> He attempted to call [Morgan]. He said, "I'm going to call him at his [campaign] headquarters." I believe his headquarters was located on North Memorial Parkway. And he said, "I'm going to let you talk to [Morgan]." And [Morgan] wasn't in the office at the time, or he was not available to come to the phone.
>
> . . .
>
> I asked him why would Tim Morgan fire me if he got into office, and he said, "Because you are supporting Brooks and you don't do that in this county." [4]

Plaintiff claims to have recorded this conversation, but none of the parties have furnished the court with a copy or transcript of the tape. Sheriff Patterson, who was a member of the Democratic party, candidly admits that he "never had any use for [Brooks], and

---

[4] Plaintiff's deposition at 14-16.

7

he's never had any use for me...."[5]    Patterson actively campaigned

for Morgan.

Shortly after plaintiff began his employment with the District

Attorney's office, he attended a picnic for Madison County

employees.  He took his two sons, who then were five and seven

years old, and they were seated at a picnic table when Patterson

approached.

> Sheriff Patterson came over on the golf cart.  ...  He got
> off the golf cart, and he had these little plastic badges.
> And he gave both my boys a badge, and he told them in my
> presence and in the presence of another deputy, "Here, take
> this badge.   Your dad's going to need it when Tim Morgan
> fires him." [6]

Plaintiff received other verbal warnings.   On one occasion,

plaintiff encountered J.R. Bullock, an African-American deputy

sheriff, in the basement of the Madison County Courthouse.  Bullock

called plaintiff "an Uncle Tom and said that Morgan was going to

fire me."[7]  Bullock actively supported Morgan's campaign, including

participating in a television commercial.   Plaintiff received

similar warnings from Sheriff's Investigators Sally Rice and Fred

Raley.  Deputy Sheriff Sharon Howard also recounted a conversation

---

[5] Patterson's deposition at 9, 12.

[6] Plaintiff's deposition at 34.  The deputy who was present during this
conversation was Levi Harris; he submitted an affidavit corroborating plaintiff's
account.  Harris' affidavit ¶ 2.

[7] Plaintiff's deposition at 51.

8

with Patterson as follows:

> On or about the 2nd week in December 1992, this writer drove
> Deputy Suttle to the maintenance shop located on Wheeler
> Ave. to pick up his unit.  Sheriff Joe W. Patterson was also
> at this location.   The three of us were engaged in a
> conversation about the vehicle's [sic] we were driving.
> Suddenly, Sheriff Patterson reminded Suttle about putting
> a[n] application in and trying to leave the sheriff's Dept.
> He then said "what happened — you were suppose to be with
> the DA's office weren't you?   What happened?"   Suttle
> replied by saying "I told you — I came to you and told you
> I was putting in for that job."   Sheriff Patterson then
> replied "You'd better be glad you didn't get the job or
> you'd be like your friend John, because when Tim gets in
> office John Jordan [won't] have a job for long," as he
> pointed his finger at Suttle.[a]

Plaintiff spoke with Tim Morgan on one occasion prior to the

election.  He was seated at his desk in the District Attorney's

Office when Larry Smith, the D.A.'s chief investigative officer,

asked plaintiff to come into his office.

Q.    Now, who invited you to their back office?

A.    Smith, Larry Smith.

Q.    And you were told Tim Morgan was on the telephone?

A.    I was told that Tim was on the phone and he would
      like to speak to me.

Q.    And what if anything did Mr. Morgan say?

A.    He said, "Hey, how're you doing."   And he asked me
      what did Brooks have me doing.

Q.    And anything else?

---

[a] Plaintiff's affidavit at exhibit F.

9

A.     He asked me if I was a member of the NAACP or the AD
       something, some other black organization.

Q.     And what did you respond?

A.     My response was no.

Q.     What if anything else did Tim Morgan say to you on
       that occasion?

A.     He told me that I needed to get with them and help
       them support him and to defeat Brooks.[9]

Plaintiff did not do so, but instead supported Morris Brooks by
passing out fliers, talking to friends, donating $25, and voting
for him in the November 1992 general election.

Morgan was sworn in as the new District Attorney on January 18,
1993.   He appointed defendant Ken Taylor as his Chief Deputy.
Taylor originally had been hired by Robert E. Cramer in August of
1988, but he resigned after Brooks was appointed to fill the
balance of Cramer's term, because "Mr. Brooks and I didn't see eye
to eye on hardly anything."[10]

After assuming the duties of his new office, Morgan was told of
an incident involving plaintiff that had occurred on January 9,
1993.  Specifically, the Huntsville Police Department had received
a report from Jewel Jordan, plaintiff's uncle, that plaintiff had
fired a handgun several times in his front yard.   According to

_____

[9] Plaintiff's deposition at 45.

[10] Taylor's deposition at 7.

10

plaintiff, the incident occurred as a result of a property dispute between that uncle and plaintiff's parents.  Plaintiff denied that he had fired a weapon, and insisted instead that his father had fired a shotgun prior to a hunting trip to "ril[e] up the dogs."[11]

Morgan conducted a meeting in his office on January 20, 1993, during which the incident was discussed.  He asked Taylor to initiate an informal investigation, and make a recommendation to him no later than January 25, 1993.  Morgan also discussed the fact that plaintiff had worked for the District Attorney's Office for less than six months and, in his view, still was on probationary status.

Taylor delivered a memorandum of his investigative findings to Morgan on January 25, 1993.  Morgan authorized Taylor to proceed on the basis of the following recommendations:

2.   **Opinions**
     a.   That the discharge of a firearm in an instance such as is alleged in the complaint is conduct which can not be tolerated by an Investigator of the Madison County District Attorney's Office.

     b.   That if Investigator Jordan is determined to have committed the act alleged, such conduct is basis to terminate his probationary period.

---

[11] Plaintiff's deposition at 71; *see also* Morgan's affidavit ¶ 2. Plaintiff contends that he voluntarily reported the incident to Larry Smith on January 11, 1999, prior to Morgan assuming his office. (Plaintiff's affidavit ¶ 23.) "Mr. Smith made no request for additional details, asked if the dispute had been resolved, and if so not [to] worry about it." (*Id.*)

11

3.   Recommendations

a.   That Investigator Jordan be offered the opportunity to submit to a polygraph exam and answer questions relating to the incident.

b.   That if Investigator Jordan refuses to submit to the polygraph exam or if he is determined to be deceptive in his answers to relevant questions, he be terminated.

c.   That if Investigator Jordan is determined to be truthful in his answers, he be continued past his probationary period. [12]

Taylor met with plaintiff later that same day, and questioned him about the incident. Taylor "was not satisfied with Jordan's explanation."[13]   Taylor gave plaintiff a copy of the memorandum he had prepared for Morgan, and asked him to read it.   Taylor then asked plaintiff whether he was willing to submit to a polygraph examination.  Plaintiff responded that he was willing to do so, but wanted to consult an attorney before taking the test.   Taylor contends plaintiff refused to submit to the examination.

In either event, after plaintiff left Taylor's office, Larry Smith asked for plaintiff's office keys and told him to return the following day to "process out."  "The next day, I went to the office to Taylor who told me that I was not fired but yet did not have a job.  I was then presented [with a] Notice of Personnel

---

[12] Morgan's affidavit at exhibit C.

[13] Taylor's affidavit ¶ 9.

Action form by Taylor, Morgan, and Smith which stated that I was terminated."[14]  The Notice stated that plaintiff was terminated due to "unsatisfactory job performance during probationary period," and was to paid for 95 hours of unused vacation time.[15]

Plaintiff appealed his termination to the Madison County Personnel Board, but they refused to hear his appeal for two reasons:  plaintiff still was a probationary employee as a result of employment with the District Attorney's Office for less than six months; and, plaintiff was an employee of the State, and thereby not entitled to the rights afforded to county employees under the Madison County Personnel Act.[16]  Morgan hired an African-American male to replace plaintiff.

### III.  DISCUSSION

**A. Defendants' Motion for Summary Judgment**

Plaintiff's third amended complaint is not a model of clarity. Despite the heightened pleading requirements for cases involving government officials, *see GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1368 (11th Cir. 1998) (noting "that the heightened pleading requirement is still the law of this circuit"), and specific instructions from this court and also the judge to

---

[14] Plaintiff's affidavit ¶ 26.

[15] Plaintiff's affidavit at Exhibit B.

[16] Plaintiff's Exhibit 7.

13

whom the action originally was assigned,[17] plaintiff's third amended complaint not only fails to clearly articulate his claims against defendants, but also includes a claim that previously has been dismissed.

Specifically, the court notes that plaintiff continues to argue the merits of his procedural due process claim, despite an order dismissing that claim with prejudice. In the memorandum opinion entered March 5, 1996, Senior U.S. District Judge E. B. Haltom, Jr. concluded that plaintiff

> had no constitutionally protected property interest in his employment as an investigator in the office of the District Attorney of Madison County, Alabama during his period of employment in that state employee position. Moreover, this Court is thoroughly persuaded and also holds that it appears beyond doubt that this Plaintiff can prove no set of facts with respect to his section 42 U.S.C. § 1983 claim for relief "for violation of due process of law by failure to follow termination procedures" against the Defendant Tim Morgan in his individual capacity or in his official capacity as District Attorney for the 23rd Judicial Circuit, State of Alabama, which would entitle him to relief against this particular defendant either in his individual or official capacity. [18]

Judge Haltom also concluded that:

> Plaintiff John Patrick Jordan served at District Attorney Morgan's pleasure and was an employee-at-will. Moreover, at all times here relevant Madison County District Attorney Tim Morgan and all employees in his office, including assistant

---

[17] The Honorable E. B. Haltom, Jr., Senior United States District Judge.

[18] March 5, 1996 Memorandum Opinion (doc. no. 52) at 48-49.

14

> district attorneys and investigators, including the
> Plaintiff, <u>were in the service of the State of Alabama</u>, were
> state employees and by statute enacted by the Legislature of
> Alabama were placed in the **exempt service** and were not
> subject to the provisions of Article I of Chapter 26, Code
> of Alabama, as amended, entitled STATE PERSONNEL DEPARTMENT
> AND MERIT SYSTEM, § 36-26-10, Code of Alabama 1975, as
> amended by Acts 1991, NO. 91-479, § 1, nor to the provisions
> of Act No. 941, Acts of Alabama 1973 Regular Session,
> approved September 5, 1973, relating to Madison County only,
> which cover and apply to Madison County employees and
> appointees holding positions in the **classified service**, as
> defined in Section 4 thereof. [19]

Subsequent to entry of that opinion, plaintiff filed his third
amended complaint, including the same allegations of procedural due
process violations and claims against defendant Morgan in his
official capacity. By order entered on May 2, 1996, Judge Haltom
struck plaintiff's claims against all defendants in their official
capacities, on the grounds that they were barred by the Eleventh
Amendment, and ordered the parties to adjust their case captions
accordingly.

Following reassignment of the action to this court, plaintiff
was allowed an opportunity to file objections to the memorandum
opinion entered by Judge Haltom.

> By separate order and absent proper objection from the
> parties, this court will enter final judgment on all
> dispositive rulings made by the Honorable E. B. Haltom, Jr.,
> Senior United States District Judge, in the order entered on
> March 5, 1996. If plaintiff has objections to these

---

[19] *Id.* at 45-46 (underline emphasis supplied).

15

rulings, plaintiff may submit to this court a brief, with
citations to and explanation of any errors of law in the
order of March 5, 1996, on or before November 16, 1998.
Defendants may submit a response to this court on or before
December 4, 1998. [²⁰]

Plaintiff requested an extension of time to file objections, which

the court granted, but plaintiff still failed to file any

objections within the extended deadline.²¹   Therefore, this court

adopted the memorandum opinion of Judge Haltom and entered the

following order:

> Accordingly, it is **ORDERED, ADJUDGED,** and **DECREED** as
> follows.   The following claims of plaintiff are **dismissed
> with prejudice**:  the first asserted claim bottomed upon 42
> U.S.C. § 1983, against any and all defendants in their
> official capacities; the due process claim asserted under 42
> U.S.C. § 1983; claims bottomed upon 42 U.S.C. § 1985 against
> any and all defendants in their official capacities; the
> claim plaintiff identified as "Violation of Alabama Act 73-
> 941 and The Personnel Plan"; and the claim for the tort of
> outrage.
>
> The claims which remain pending subject to discovery and
> trial are plaintiff's § 1983 claim against defendant Morgan
> in his individual capacity and the claim asserted under §
> 1985 against defendants Morgan, Taylor, and Patterson in
> their individual capacities. [²²]

Moreover, this court has independently examined plaintiff's due

process claims and finds that Judge Haltom reached the proper

result by dismissing them on their merits.   The Alabama Supreme

---

[20] Doc. no. 62.

[21] *See* doc. no. 65 at 1.

[22] Order entered on December 7, 1998 (doc. no. 65) at 2 (underline emphasis
supplied).

16

Court has clearly held, on almost identical facts, that investigators at the District Attorney's office are classified employees of the <u>state</u>, not the county in which they are employed:

> District attorneys are state employees whose salaries are funded by the state. Each district attorney in each judicial circuit is authorized by § 12-17-220(a) to hire investigators and other personnel that he determines are necessary, with the salary of these employees to be funded by the state. By virtue of the fact that a district attorney is a state employee, we conclude that those in his employ are also state employees.

*Hooks v. Hitt*, 539 So. 2d 157, 159 (Ala. 1988); *see also Whitten v. Lowe*, 677 So. 2d 778 (Ala. Civ. App. 1995) (applying the logic of *Hooks* and concluding that a sheriff's deputy is a state employee and, thus, not entitled to protection under the local act).

Plaintiff argues the present case is distinguishable from *Hooks*, because the Madison County Personnel Act specifically applies to "Assistant District Attorneys and all employees of the circuit district attorney."[23]

---

[23] That local Act, which was enacted in 1973, provides in pertinent part:

Section 4. The provisions of this Act shall apply to the following officers and employees in the service of the county:

. . .

(c)  All employees of the county sheriff;

. . .

(g)  All Assistant District Attorneys and all employees of the circuit district attorney.

. . .

(m)  All other officers and employees in the service of the county <u>except</u>:

. . .

(v)  Persons in the "classified service"

17

Subsequent to the *Hooks* decision, however, the Alabama
Legislature enacted a statute applying to the state as a whole, and
thereby specifically declared that all employees of any district
attorney are "exempt employees" and "serve at the pleasure of the
district attorney." (Act No 91-479; Alabama Code §§ 12-17-220, 36-
26-10.) Act No. 91-479 amended two provisions of the Alabama Code,
sections 12-17-220 and 36-26-10, and also specifically provided
that its provisions "shall have retroactive effect to May 18,
1977." (Alabama Code § 36-26-11, code commissioner's note.)
Alabama Code § 36-26-10 now provides that "[a]ll employees of a
district attorney's office" are "exempt" from the Alabama Merit
Systems Act, Alabama Code § 36-26-1 et *seq*. Alabama Code § 12-17-
220 also contemplates that salaries and other benefits of District
Attorney employees may be locally supplemented by counties, but
they remain employees of the state:

> (a) The district attorney of each judicial circuit is hereby
> authorized to employ, in any manner as he or she shall
> determine necessary, assistant district attorneys,
> investigators, clerical, secretarial, and other personnel,
> who shall be paid from funds available for that purpose.
> Unless otherwise provided by local law for Talladega County,
> all of these employees shall serve at the pleasure of the

within the meaning of and subject to
the State of Alabama merit system
under any present or future law, and
so long as any such law remains
effective....

18

<u>district attorney and shall not be considered employees under the State Merit System Act</u>.

(b) The district attorney is authorized to supplement the salaries of personnel employed within his or her office.

(c) The district attorney is authorized to use funds available to him or her from all sources such as grants, appropriations, gifts, and other sources for the purposes stated in this section or for any other law enforcement purpose.

(d) <u>Counties are authorized to supplement state expenditures as they deem necessary</u> and shall provide other financial support as required by laws in effect on September 30, 1977.

Ala. Code § 12-17-220 (emphasis supplied).

The implication of Act No. 91-479 is that <u>all</u> district attorney employees are at-will employees of the State, who serve at the pleasure of the District Attorney. To the extent that any Alabama state court previously indicated that the employees were subject to the state merit system as "classified employees," *see e.g.*, *Hooks*, 539 So. 2d at 160, the Alabama Legislature has determined otherwise, by classifying them as "exempt employees."

Moreover, to the extent that the Madison County Personnel Act, Act No. 73-941, conflicts with Act No. 91-479, the latter act of general application has impliedly repealed the former act of local implication. As noted by the Alabama Supreme Court:

There is no rule which prohibits the repeal by implication of a special or specific act by a general or broad one. <u>The question is always one of legislative intention, and the</u>

19

> special or specific act must yield to the later general or
> broad act, where there is a manifest legislative intent that
> the general act shall be of universal application
> notwithstanding the prior special or specific act. ... [I]t
> is a canon of statutory construction that a later statute
> general in its terms and not expressly repealing a prior
> special or specific statute, will be considered as not
> intended to affect the special or specific provisions of the
> earlier statute, unless the intention to effect the repeal
> is clearly manifested or unavoidably implied by the
> irreconcilability of the continued operation of both, or
> unless there is something in the general law or in the
> course of legislation upon its subject matter that makes it
> manifest that the legislature contemplated and intended a
> repeal.

*Buskey v. Mobile County Board of Registrars*, 501 So. 2d 447, 452

(Ala. 1987) (quoting *Connor v. State*, 275 Ala. 230, 234, 153 So. 2d

787, 791-92 (1963) (emphasis supplied)). Because the latter act,

Act No. 91-479, directly contradicts the Madison County Personnel

Act, and cannot be reconciled with regard to the status of District

Attorneys and their employees, the latter act controls and

establishes that plaintiff is a state employee. Plaintiff's due

process claims were properly dismissed.

Accordingly, this court now turns to an examination of

plaintiff's complaint to ascertain what remaining allegations

support his § 1983 claim against Morgan. The court construes his

complaint as containing two theories: first, that plaintiff was

terminated in violation of his First Amendment right to freedom of

20

association, as made applicable to the states by the Fourteenth Amendment (*see Fiske v. Kansas*, 274 U.S. 380, 386-87, 47 S.Ct. 655, 657, 71 L.Ed. 1108 (1927)); and second, that he was terminated in violation of his Fourteenth Amendment right to equal protection. Specifically, plaintiff alleges:

     20.    Upon information and belief, Plaintiff's political support for Brooks and/or Plaintiff's race (black), was a substantial or motivating factor underlying Morgan's decision to fire Plaintiff and was the direct and proximate cause of Morgan's decision to fire Plaintiff.

     21.    Upon information and belief, Morgan fired Plaintiff as an investigator in the D.A.'s Office because Plaintiff was hired by Brooks, Morgan's political rival, and because Plaintiff supported Brooks during the election for District Attorney. These actions were the direct and proximate cause of Morgan's decision to fire Plaintiff.

    . . .

     24.    [Morgan's] actions violate the right of individuals to be free from race discrimination regarding matters of employment and to be free from penalties for the exercise of free speech, the right of association, . . . and equal protection of the laws which are protected by the First and Fourteenth Amendments to the United States Constitution. [24]

Defendants move for summary judgment as to all of plaintiff's remaining claims. With regard to plaintiff's § 1983 claims, Morgan argues that he is entitled to qualified immunity, because plaintiff has failed to prove that his conduct violated clearly established

---

[24] Third amended complaint at 4-5.

law.  With regard to plaintiff's § 1985 claims, defendants argue
that plaintiff has failed to prove that the alleged conspiracy was
motivated by racial animus.  The court now addresses the merits of
these arguments.

### 1.    Plaintiff's § 1983 claims

Section 1983 creates a private right of action for damages and
injunctive relief against individuals and governmental entities
whose conduct under color of state law deprives a plaintiff of
rights, privileges, or immunities secured by the United States
Constitution or federal statutes.[25]   In actions bottomed upon
section 1983, state governmental officials performing discretionary
functions may avoid liability when sued in their individual
capacity by showing entitlement to "qualified immunity."
"Government officials performing discretionary functions are
entitled to qualified immunity 'insofar as their conduct does not
violate clearly established statutory or constitutional rights of

---

[25] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage of any State or Territory or the District of
Columbia, subjects, or causes to be subjected, any citizen of the
United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for
redress.  For the purposes of this section, any Act of Congress
applicable exclusively to the District of Columbia shall be
considered to be a statute of the District of Columbia.

22

which a reasonable person would have known.'" *Hartley v. Parnell*,
No. 98-6829, 1999 WL 979614 at *3 (11th Cir. Oct. 28, 1999)
(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727,
2738, 73 L.Ed.2d 396 (1982)).

Moreover, qualified immunity is much more than simply a defense
to liability; indeed, the doctrine "provides the right not to be
burdened by trial." *Tinney v. Shores*, 77 F.3d 378, 380 (11th Cir.
1996). Qualified immunity is construed broadly. It "gives ample
room for mistaken judgments by protecting all but the plainly
incompetent and those who knowingly violate the law." *Hunter v.
Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589
(1991) (internal quotations omitted).

The burden placed on a plaintiff opposing a qualified immunity
defense is onerous.

> A plaintiff must establish more than broad legal truisms; he
> or she must demonstrate that the law fixed the contours of
> the right so clearly that a reasonable official would have
> understood his acts were unlawful. ... Thus, "pre-existing
> law must dictate, that is truly compel (not just suggest or
> allow or raise a question about), the conclusion for every
> like-situated, reasonable government agent that what
> defendant is doing violates federal law in the
> circumstances." *Lassiter v. Alabama A & M University, Bd.
> of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)(*en banc*).
> Moreover officials need not "'be creative or imaginative in
> drawing analogies from previously decided cases.'" *Id.* at
> 1150. (citations omitted).

23

*Dolihite v. Maughon*, 74 F.3d 1027, 1040-41 (11th Cir.), **cert.**

**denied,** 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996).

The Eleventh Circuit has framed the qualified immunity standard

as follows:

> Once a defendant advances a defense of qualified immunity,
> he is entitled to summary judgment unless "the legal norms
> allegedly violated by the defendant were clearly established
> at the time of the challenged actions...." *Mitchell v.*
> *Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.
> 411 (1985). "The words 'clearly established ...
> constitutional rights' may not be used to read the defense
> of immunity out of federal tort law by the facile expedient
> of stating constitutional rights in the most general
> possible terms...." *Azeez v. Fairman*, 795 F.2d 1296, 1301
> (7th Cir. 1986). The Supreme Court has stressed that "the
> right the official is alleged to have violated must have
> been 'clearly established' in a more particularized, and
> hence more relevant, sense: The contours of the right must
> be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right."
> *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039,
> 97 L.Ed.2d 523 (1987).
>
> An official will be immune if "the law with respect to
> [his] actions was unclear at the time the cause of action
> arose" or if "'a reasonable officer could have believed ...
> [his actions] to be lawful, in light of clearly established
> law and the information ... [the officer] possessed.'" *Clark*
> *v. Evans*, 840 F.2d 876, 879-80 (11th Cir. 1988)(quoting
> *Anderson v. Creighton*, 107 S.Ct. at 3040). For purposes of
> qualified immunity, an abstract mandate to act "with care"
> or "reasonably" is too vague; "generalities are just not
> helpful." *Muhammad v. Wainwright*, 839 F.2d 1422, 1424
> (11th Cir. 1987); *see Clark v. Evans*, 840 F.2d at 881, 882
> (proper inquiry is "fact-specific"; officer who shot and
> killed fleeing prisoner immune because "[n]o case ha[d]
> expressly held that an officer has to first shoot to maim
> before shooting to kill"). In sum, "the qualified immunity

defense ... provides ample protection to all but the plainly
incompetent or those who knowingly violate the law." *Malley
v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.
271 (1986).

*Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir. 1989).

The Eleventh Circuit defines the district court's inquiry on a
motion for summary judgment asserting qualified immunity as
follows:

> [T]he relevant question on a motion for summary judgment
> based on a defense of qualified immunity is whether a
> reasonable official could have believed his or her actions
> were lawful in light of clearly established law and the
> information possessed by the official at the time the
> conduct occurred.

*Stewart v. Baldwin County Bd. of Education*, 908 F.2d 1499, 1503
(11th Cir. 1990).[26]   Thus, this court must address whether the law
clearly establishes the conclusion that, on January 25, 1993, the
date Morgan terminated plaintiff's employment, a reasonable
official, knowing what Morgan knew, would have realized that such
action violated plaintiff's First and Fourteenth Amendment rights.

---

[26] The Supreme Court has also elaborated on the district court's role at
the summary judgment stage in noting that:

> [o]n summary judgment, the judge appropriately may determine, not
> only the currently applicable law, but whether that law was clearly
> established at the time an action occurred. If the law at that time
> was not clearly established, an official could not reasonably be
> expected to anticipate subsequent legal developments, nor could he
> fairly be said to "know" that the law forbade conduct not previously
> identified as unlawful.

*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (footnote omitted).

*See Parrish v. Nikolits*, 86 F.3d 1088, 1095 (11th Cir. 1996)
(examining clearly established law for qualified immunity purposes
"as it existed on January 5, 1993, the date [defendant] terminated
the plaintiffs' employment").

### a.   The First Amendment Claims

Plaintiff asserts that Morgan wrongfully discharged him for
political patronage reasons and for the exercise of free speech,
rather than for unsatisfactory job performance during his
probationary period.

The Supreme Court has held that the First Amendment[27] prohibits
a public employer from conditioning employment on a basis that
violates an employee's freedom of expression:

> [E]ven though a person has no "right" to a valuable
> government benefit and even though the government may deny
> him the benefit for any number of reasons, there are some
> reasons upon which the government may not rely. It may not
> deny a benefit to a person on a basis that infringes his
> constitutionally protected interests — especially, his
> interest in free speech.

---

[27] The First Amendment to the United States Constitution states:

Congress shall make no law respecting an establishment of religion,
or prohibiting the free exercise thereof; or abridging the freedom
of speech, or of the press, or the right of the people peaceably to
assemble, and to petition the Government for a redress of
grievances.

U.S. Const. amend. I.   The Amendment was made applicable to the several states
through the Fourteenth Amendment.   *See Fiske v. Kansas*, 274 U.S. 380, 386-87, 47
S.Ct. 655, 657, 71 L.Ed. 1108 (1927).

26

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

The courts have distinguished two classes of conduct in which a public employee's discharge implicates the First Amendment: those resulting from "raw political patronage" (*e.g.*, *Terry v. Cook*, 866 F.2d 373, 375 (11th Cir. 1989)); and, those involving employee expression (*e.g.*, *Morris v. Crow*, 117 F.3d 449, 455 (11th Cir. 1997)). Here, plaintiff invokes both classes. Because the analysis for each classification is "markedly different," *see Morris*, 117 F.3d at 456, the court addresses each in turn.

### (1) Political patronage

Most governmental employees enjoy a First Amendment right not to be fired on the basis of raw political patronage. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). "The paradigm political patronage case involves a situation in which an employee's retention of public employment is conditioned on the employee's support of the political party in office." *Stough v. Gallagher*, 967 F.2d 1523, 1527 (11th Cir. 1992). As Justice Brennan explained:

> if conditioning the retention of public employment on the
> employee's support of the in-party is to survive

27

constitutional challenge, it must further some vital
government end by a means that is least restrictive of
freedom of belief and association in achieving that end, and
the benefit gained must outweigh the loss of
constitutionally protected rights.

*Elrod,* 427 U.S. at 363, 96 S.Ct. at 2685.

The "ultimate inquiry is not whether the label 'policymaker' or

'confidential' fits a particular position; rather the question is

whether the hiring authority can demonstrate that party affiliation

is an appropriate requirement for the effective performance of the

public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at

1295. This analysis requires "open-ended inquiries into specific

work-place relationships that may underlie overt expressive

conduct." *Stough,* 967 F.2d at 1527.

For Morgan to prevail on the basis of qualified immunity to such

a claim, "it is enough if it was not clearly established that

firing [plaintiff] for political patronage reasons would violate

federal law." *Beauregard v. Olson,* 84 F.3d 1402, (11th Cir. 1996).

In other words, "the law must have earlier been developed in such

a concrete and factually defined context to make it obvious to

every reasonable person in [Morgan's] place that to fire [plaintiff

because he had supported Brooks] would violate federal law." *Id.*

The Eleventh Circuit has held, for example, that <u>deputy sheriffs</u>

28

are the "alter ego[s]" of the sheriff and, thus, are susceptible to

patronage dismissals. *See Terry v. Cook*, 866 F.2d 373, 377 (11th

Cir. 1989). The *Terry* court reasoned that "[u]nder Alabama law, a

deputy sheriff is the general agent of and empowered to enter into

business transactions for the sheriff." *Id.*   The court also

explained:

> The closeness and cooperation required between sheriffs and
> their deputies necessitates the sheriff's absolute authority
> over their appointment and/or retention. ...   Under the
> *Elrod-Branti* standard, loyalty to the individual sheriff and
> the goals and policies he seeks to implement through his
> office is an appropriate requirement for the effective
> performance of a deputy sheriff. Such a requirement strikes
> at the heart of the *Elrod-Branti* least restrictive means
> test which balances first amendment rights of the deputies
> and the need for efficient and effective delivery of public
> services. <u>We can find no less restrictive means for meeting
> the needs of public service in the case of the sheriff's
> deputy than to acknowledge a sheriff's absolute authority of
> appointment and to decline to reinstate those who did not
> support him</u>.

*Id.* (emphasis supplied).   The *Terry* court did not reach the same

conclusion with regard to a sheriff's <u>investigators</u>, however.

> It has <u>not</u> been established that loyalty to an individual
> sheriff is an appropriate requirement for effective job
> performance for the remaining positions of clerk,
> <u>investigator</u>, dispatcher, jailer, and process server. This
> is a determination that depends upon the actual
> responsibilities of each position and the relationship of
> each to the sheriff.   Indeed, in *Branti*, the Court
> acknowledged that the duties of the employees, who included
> a process server, bailiff, and security guard, were not of
> such character that party affiliation was an acceptable

29

requirement for employment. Such positions traditionally revolve around limited objectives and defined duties and do not require those holding them to function as the alter ego of the sheriff or ensure that the policies and goals of the office are implemented. <u>Although it can be said that each job in the sheriff's office implements the policies of the office, the limited and defined roles these five positions tend to play do not support the need for political loyalty to the individual sheriff</u>.

*Id.* (emphasis supplied).

Although *Terry* seems to discourage the notion that a sheriff's investigators are immune from First Amendment coverage, *Terry* did not definitively hold that such was always the case. Rather, the court said that such a determination must be made on a case-by-case basis, "depend[ing] upon the actual responsibilities of each position and the relationship of each to the sheriff." *Terry, supra.*

The problem here, however, is that Morgan has failed to demonstrate either that party affiliation or personal support of his candidacy is an appropriate requirement for the position of criminal investigator in his office. Morgan has not submitted <u>any</u> evidence regarding "[t]he inherent powers and actual job responsibilities of [a criminal investigator], and the relationship of the particular position to the elected official." *Parrish v. Nikolits,* 86 F.3d 1088, 1093 (11th Cir. 1996). Morgan has the

30

burden to demonstrate "that party affiliation [or campaign support] is an appropriate requirement for the effective performance of the position[] at issue...." *Id.* He has not done so and, accordingly, summary judgment as to this claim is not appropriate.

### (2) Freedom of expression

"[C]ases involving the overt expression of ideas or political speech, unlike political patronage cases, require the open-ended inquiry or method of analysis the Supreme Court established in *Pickering* [*v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ]." *Stough*, 967 F.2d at 1527 (citation and internal quotation marks omitted). That analysis requires the court to balance "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, at 568, 88 S.Ct. at 1734-35.

The Eleventh Circuit has established a more detailed, four-part test to determine whether an employer's action constitutes retaliation for an employee's exercise of free speech rights:

> First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the

31

interest of the state, as an employer, in promoting the
efficiency of the public services it performs through its
employees.  Should the employee prevail on the balancing
test, the fact-finder determines whether the employee's
speech played a substantial part in the government's
decision to demote or discharge the employee.  Finally, if
the employee shows that the speech was a substantial
motivating factor in the employment decision, the state must
prove by a preponderance of the evidence that it would have
reached the same decision ... even in the absence of the
protected conduct.

*Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (citations and

internal quotations omitted).  The first two steps present

questions of law to be decided by the court; the remaining two are

questions of fact for determination by a jury.  *Id.*

Morgan contends that plaintiff's free speech claim must fail,

because "Jordan makes no allegation of any speech or expression

which Jordan made in support of Brooks or in opposition to

Morgan."[28]  In response, plaintiff contends that his transfer from

the Madison County Sheriff's Department to the District Attorney's

Office "constituted symbolic speech [that] led to his

termination."[29]  Plaintiff also alleges that "he passed out fliers,

and he passed out signs," both of which constitute symbolic

speech.[30]  Finally, in deposition, plaintiff testified that he

---

[28] Defendants' Brief (doc. no. 75) at 18-19.

[29] Plaintiff's brief (doc. no. 84) at 13.

[30] *Id.* at 15.

32

contributed $25 to Brooks' campaign.[31]    The Eleventh Circuit, however, rejected similar arguments in *Cutcliffe v. Cochran*, 117 F.3d 1353 (11th Cir. 1997).

In *Cutcliffe*, several deputy sheriffs who had been dismissed claimed that such action was in retaliation for political activities.    The court affirmed the dismissal of their political patronage claims on the ground that they were precluded by *Terry*. Plaintiffs also alleged that their terminations amounted to a violation of their free speech rights, but the court disagreed.

> Specifically, plaintiffs asserted in their complaint that they "participated in public political activity in support of Navarro on several occasions ... and contributed personal funds to Navarro's campaign."  This allegation simply conveys plaintiffs' political affiliation.  Had there been allegations that the expressions involved more than bare statements of support for a candidate, the claim would deserve a more detailed analysis under *Pickering*.  At this point, as in *Branti*, the only interest at issue is the right of political affiliation which, that case teaches us, cannot be overcome except by a determination that affiliation is essential to the employee's effectiveness.  The record supports the district court's finding that plaintiffs "were terminated on the basis of their loyalty and support for the former sheriff.  This is a classic *Elrod-Branti* political patronage dismissal case."

*Cutcliffe*, 117 F.3d at 1358.

This court likewise concludes that this is a "classic ... political patronage dismissal case" and, therefore, finds that

---

[31] Plaintiff's deposition at 43.

33

summary judgment is due to be granted as to plaintiff's free speech claim. Plaintiff's principal complaint is that he was terminated for supporting Morris Brooks, the former District Attorney. While he also may have passed out fliers and contributed money to Brooks' campaign, plaintiff has not alleged that he made any specific statements during those activities that would lead the court to believe that a *Pickering* analysis is warranted. The only expression those activities convey is that he supported Morris Brooks for District Attorney, and that expression is protected by the political patronage analysis.

### b. The Equal Protection Claim

Plaintiff's equal protection claim is grounded in his belief that he was terminated on the basis of his race. Plaintiff has <u>not</u> alleged, however, a violation of either Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et *seq.*, or 42 U.S.C. § 1981.[32]

The Equal Protection Clause of the Fourteenth Amendment commands that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14. "The Equal Protection Clause 'is essentially a directive that

---

[32] Morgan is the only defendant who remains potentially liable for an equal protection violation. By order entered on October 30, 1998 (doc. no. 61), this court dismissed defendants Patterson and Taylor from plaintiff's § 1983 claims.

34

all persons similarly situated should be treated alike.'" *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989). To state an equal protection claim, plaintiff must establish that he was similarly situated with individuals who were treated differently than he, and that the disparate treatment was based on his membership in a protected class, such as "race, religion [or] national origin...." *Damiano v. Florida Parole and Probation Commission*, 785 F.2d 929, 932 (11th Cir. 1986).

A district court must first determine whether the governmental actor acted with the intent to discriminate. *Mencer v. Hammonds*, 134 F.3d 1066, 1070 (11th Cir. 1998). Although subjective intent is typically irrelevant in a qualified immunity analysis, an essential element in an equal protection claim is a finding of "intentional or purposeful discrimination." *See, Mencer*, 134 F.3d at 1070-71 (citing *Parks v. City of Warner Robins, Georgia*, 43 F.3d 609, 616 (11th Cir. 1995) ("[P]roof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim."); *Washington v. Davis*, 426 U.S. 229, 239-45, 96 S.Ct. 2040, 2047-50, 48 L.Ed.2d 697 (1976) (same)). Thus, not only must plaintiff prove that he was treated differently than similarly situated employees, but also that the disparate treatment was the

35

result of intentional discrimination on the basis of his race. *See*

*Bass v. Albany*, 968 F.2d 1067, 1070 (11th Cir. 1992).

Here, plaintiff has failed to offer any proof of intentional

racial animus. In his deposition, plaintiff was specifically asked

whether his race played any role in his termination, and he

responded "I don't know." (Plaintiff's deposition at 67.)

Moreover, plaintiff neither alleges, nor argues, that Morgan

treated him differently from similarly situated employees who did

not share his African-American heritage. In other words, plaintiff

does not provide the name of any Caucasian investigator in the

District Attorney's office who was retained by Morgan, even though

they also supported the election of Morris Brooks or engaged in

"unsatisfactory job performance during probationary period."

In his brief opposing summary judgment, plaintiff merely argues

that "race was an issue" in his termination, rather than that he

was intentionally discriminated against. He also relies on

statements made by persons other than Morgan.

> Jordan was told by Sheriff Patterson that 'black persons
> don't support Republicans. This type of remark demonstrates
> an intent to discriminate on the basis of race. The Sheriff
> was upset that an African-American person was going to work
> for the Republican candidate. ... Taylor testified that it
> was the talk of the court house that a black guy went to
> work for Mo Brooks. Race was an issue.[11]

---

[11] Plaintiff's brief (doc. no. 84) at 24.

36

Such an argument is entirely insufficient to prove that <u>Morgan</u> intentionally discriminated against plaintiff because of his race.

Indeed, the only statement made by Morgan that implicates plaintiff's race occurred during a telephone conversation before Morgan was elected to the office of District Attorney. According to plaintiff, Morgan "asked me if I was a member of the NAACP or the AD something, some other black organization. ... He told me that I needed to get with them and help them support him and defeat Brooks." (Plaintiff's deposition at 45.) Such statements are woefully inadequate to prove that Morgan intentionally fired plaintiff because of his race. Accordingly, the court is unable to find a genuine issue of material fact regarding plaintiff's equal protection claim.

### 2. Plaintiff's § 1985 Claims

Plaintiff also contends that Morgan, Patterson, and Taylor conspired to prevent him from supporting Brooks. Specifically, plaintiff alleges:

> 26.    Plaintiff alleges that there was a conspiracy that he be terminated at the conclusion of the election if Morgan should enjoy victory. Plaintiff was informed by Defendant Patterson that black persons don't vote for Republicans.
> ...
> 28.    Defendants Morgan, Patterson, and Taylor conspired to prevent Mr. Jordan from supporting Mr. Brooks in the election. Mr. Jordan, the sole black investigator, was

37

> terminated in furtherance of the conspiracy.  The defendant
> took this action because of the plaintiff's race and
> political beliefs. [34]

Although plaintiff does not identify which of the three subsections

of section 1985 is the basis for his conspiracy claim, the court

presumes that he intended to invoke the third,[35] because that

subsection creates a cause of action for conspiracies which deprive

persons of the equal protection of the law or other federal rights,

privileges, or immunities.[36]

---

[34] Third amended complaint at 5.

[35] The first subsection of § 1985 proscribes interference with the
performance of a federal officer's official duties.  See 42 U.S.C. § 1985(1).
The second addresses conspiracies to obstruct justice through the intimidation
of parties, witnesses or jurors in judicial proceedings.  See 42 U.S.C. §
1985(2).  As discussed in the text following this note, the third subsection
prohibits agreements to deprive persons of their civil rights.  See 42 U.S.C. §
1985(3).

   The court also marginally notes that the doctrine of qualified immunity is
not available as a defense to a § 1985(3) claims, because "the narrow intent
element of § 1985(3) erects a significant hurdle for § 1985(3) plaintiffs,
thereby obviating the need for granting public officials qualified immunity with
respect to a § 1985(3) claim." Johnson v. City of Fort Lauderdale, Florida, 126
F.3d 1372, 1379-80 (11th Cir. 1997).

> Unlike in section 1983 actions, public officials therefore will not
> be subject to liability under section 1985(3) unless their actions
> were motivated by "some racial, or perhaps otherwise class-based,
> invidiously discriminatory animus."  This narrow intent requirement
> erects a significant hurdle for section 1985(3) plaintiffs.  Section
> 1985(3) actions often stand or fall on the plaintiff's ability to
> establish the specific type of discriminatory animus behind the
> conspirators' actions.  Public officials thereby enjoy an additional
> protection against section 1985(3) actions not available to them in
> section 1983 actions.

Burrell v. Board of Trustees of Georgia Military College, 970 F.2d 785, 794 (11th
Cir. 1992).

[36] 42 U.S.C. § 1985(3) provides, in its entirety:

>    If two or more persons in any State or Territory conspire or

38

Section 1985(3) originally was enacted as part of the Ku Klux

Klan Act of 1871, and "in response to widespread violence and acts

of terror directed at blacks and their supporters in the postwar

South." *Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155, 157

(4th Cir. 1985) (citation omitted).  Section 1985(3) does not

provide any "substantial rights itself," but rather "[t]he rights,

privileges, and immunities that § 1985(3) vindicates must be found

elsewhere...."  *United Brotherhood of Carpenters & Joiners v.*

*Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049

(1983).

To establish a claim under section 1985(3), a plaintiff must

prove: "(1) a conspiracy; (2) for the purpose of depriving, either

---

> go in disguise on the highway or on the premises of another, for the
> purpose of depriving, either directly or indirectly, any person or
> class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws;  or for the purpose of
> preventing or hindering the constituted authorities of any State or
> Territory from giving or securing to all persons within such State
> or Territory the equal protection of the laws; or if two or more
> persons conspire to prevent by force, intimidation, or threat, any
> citizen who is lawfully entitled to vote, from giving his support or
> advocacy in a legal manner, toward or in favor of the election of
> any lawfully qualified person as an elector for President or Vice
> President, or as a Member of Congress of the United States;  or to
> injure any citizen in person or property on account of such support
> or advocacy;  in any case of conspiracy set forth in this section,
> if one or more persons engaged therein do, or cause to be done, any
> act in furtherance of the object of such conspiracy, whereby another
> is injured in his person or property, or deprived of having and
> exercising any right or privilege of a citizen of the United States,
> the party so injured or deprived may have an action for the recovery
> of damages occasioned by such injury or deprivation, against any one
> or more of the conspirators.

39

directly or indirectly, any person or class of persons of the equal
protection of the laws, or of equal privileges and immunities under
the laws;   and (3) an act in furtherance of the conspiracy; (4)
whereby a person is either injured in his person or property or
deprived of any right or privilege of a citizen of the United
States."   *Scott*, 463 U.S. at 828-29, 103 S.Ct. at 3356.   These
elements may be established by circumstantial evidence, and do not
require proof equivalent to a smoking gun.   *Burrell v. Board of
Trustees of Georgia Military College*, 970 F.2d 785, 793 (11th Cir.
1992).

     The issue in the present case, as in many cases under § 1985(3),
is whether plaintiff has satisfied the second requirement.   In
construing this requirement, the Supreme Court has determined that
"the conspiracy not only must have as its purpose the deprivation
of 'equal protection of the laws, or of equal privileges and
immunities under the laws,' but also must be motivated by '<u>some</u>
<u>racial, or perhaps otherwise class-based, invidiously discrimi-</u>
<u>natory animus behind the conspirators' action</u>.'" *Scott*, 463 U.S. at
829, 103 S.Ct. at 3356 (quoting *Griffin v. Breckenridge*, 403 U.S.
88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (emphasis
supplied)).   Although the Court has held that the statute does not

40

include "conspiracies motivated by bias towards others on account

of their economic views, status, or activities," *Scott*, 463 U.S.

at 837, 103 S.Ct. at 3361, the Court declined to decide "whether a

conspiracy motivated by invidiously discriminatory intent other

than racial bias would be actionable...." *Griffin*, 403 U.S. at 102

n.9, 91 S.Ct. at 1798 n. 9 (emphasis supplied).

The Court cautioned against a broad interpretation of § 1985(3),

warning that the statute was not intended to act as "a general

federal tort law" that would "apply to all tortious, conspiratorial

interferences with the rights of others." *Id.* at 101-02, 91 S.Ct.

at 1798.   The Court stated:

> In the first place, it is a close question whether § 1985(3)
> was intended to reach any class-based animus other than
> animus against Negroes and those who championed their cause,
> most notably Republicans.   The central theme of the bill's
> proponents was that the Klan and other were forcibly
> resisting efforts to emancipate Negroes and give them equal
> access to political power.    The predominant purpose of §
> 1985(3) was to combat the prevalent animus against Negroes
> and their supporters.    The latter included Republicans
> generally, as well as others, such as Northerners who came
> with sympathetic views towards the Negro.

*Scott*, 463 U.S. at 836, 103 S.Ct. at 3360.   The Court also

counseled against the argument that the statute encompassed all

political disputes.

> [W]e find difficult the question whether § 1985(3) provided
> a remedy for every concerted effort by one political group

41

to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means. To accede to that view would go far towards making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985 would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

*Id.*

Defendants argue that plaintiff has failed to prove that the alleged conspiracy was motivated by racial animus. Defendants direct the court to the portion of plaintiff's deposition where, when asked if race played any role in his termination, he replied, "I don't know." (Plaintiff's deposition at 67.) Defendants also contend that "Jordan makes no allegation that any other Black person was targeted. A Black person was hired to replace Jordan, a clear indication of lack of racial animus." (Defendants' brief (doc. no. 75) at 51.)

The court concludes, as it did in consideration of plaintiff's equal protection claim, that plaintiff has not produced sufficient evidence to establish that defendants were motivated by racial animus. Accordingly, plaintiff's only remaining argument for "class-based, invidiously discriminatory animus" is his political affiliation.

42

Plaintiff argues that he is entitled to protection, because the

Supreme Court in *Scott* "interpreted the statute to protect African-

Americans and Republicans. Sheriff Patterson, upset at Jordan for

transferring to work for a Republican, attempted to discourage

Jordan as an African-American from supporting a Republican.

Sheriff Patterson's conduct falls into the area which is

contemplated by 42 U.S.C. § 1985(3)." (Plaintiff's brief (doc. no.

84) at 25.)

The problem with plaintiff's argument, however, is that he has

never alleged that he was a Republican. To be sure, plaintiff

contends in his complaint that "[t]he defendant took this action

because of the plaintiff's ... political beliefs," but he fails to

expound on the class implications of such "beliefs," which could be

no wider than plaintiff's personal support of his employer, Morris

Brooks.

> The notion of a cognizable class includes two separate and
> distinct components. The first component focuses on the
> substantive characteristic defining the class, e.g., race or
> gender or political affiliation. ... The second component,
> by contrast, focuses not on the particular defining
> characteristic of the putative class, but on whether there
> is any identifiable class at all. ... No matter what the
> alleged basis for discrimination, the allegation of a
> "class-based animus" naturally presumes that there is a
> specific, identifiable class against whom the defendants
> have discriminated. ... Though there is no comprehensive
> set of rules for determining when individuals constitute a
> class for purposes of § 1985(3), there are certain

43

inescapable minimum requirements. For instance, it is clear
that at the very least a class must be more than just a
group of persons who bear the brunt of the same allegedly
tortious behavior.

*Aulson v. Blanchard*, 83 F.3d 1, 5 (1st Cir. 1996) (emphasis

supplied). As Justice Scalia has explained:

> Whatever may be the precise meaning of a "class" for
> purposes of *Griffin's* speculative extension of § 1985(3)
> beyond race, the term unquestionably connotes something more
> than a group of individuals who share a desire to engage in
> conduct that the § 1985(3) defendant disfavors. Otherwise,
> innumerable tort plaintiffs would be able to assert causes
> of action under § 1985(3) by simply defining the aggrieved
> class as those seeking to engage in the activity the
> defendant has interfered with.

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 113

S.Ct. 753, 759, 122 L.Ed.2d 34 (1993).

Plaintiff does not clearly define <u>any</u> distinct and identifiable

class.[37]   He does not identify any other individuals who were

---

[37] Even if plaintiff had identified the pertinent class as a political
party, which he did not, the court is uncertain as to whether such allegations
would survive summary judgment. The court notes that the Eleventh Circuit has
not addressed the issue of whether political parties are a "class of persons"
within the meaning of § 1985(3).

Moreover, the circuits that have addressed this issue are sharply divided
as to whether the statute allows actions for purely political conspiracies. *See*
*Gleason v. McBride*, 869 F.2d 688, 695 (2nd Cir. 1989) (concluding that
plaintiff's conspiracy claim must be more than a claim that he was discriminated
against as an individual because of personal malice resulting from political
opposition — complaint must disclose who besides plaintiff may belong to
purported class); *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985) (reasoning
that "§ 1985(3) does not reach nonracial political conspiracies"); *Harrison v.
KVAT Food Management, Inc.*, 766 F.2d 155, 163 (4th Cir. 1985) (deciding that
after the Supreme Court's opinion in *Scott*, Republicans as a class are not
protected by § 1985(3)); *Brown v. Reardon*, 770 F.2d 896 (10th Cir 1985) (stating
that after *Scott*, wholly political conspiracies are apparently outside the scope
of § 1985(3)).

44

likewise discriminated against for supporting Brooks; he seeks only
to recover for harm that he personally suffered.  Such allegations
are insufficient to warrant protection under § 1985(3). *See Aulson*,
83 F.3d at 6 (concluding that group of persons identified as
"opposed to the politics of the old guard" was an insufficiently
identifiable class); *Rodgers v. Tolson*, 582 F.2d 315, 318 (4th Cir.
1978) (rejecting alleged class partly because it was "impossible to
determine who besides the [plaintiffs] belong to this class," and
because plaintiffs had failed to identify "a larger group that
could be objectively identified by an observer"); *Bricker v. Crane*,
468 F.2d 1228, 1233 (1st Cir. 1972) (noting that a class must be
"readily recognizable" in order to come within the scope of §
1985(3)).   Accordingly, plaintiff's § 1985 claim is due to be
dismissed.

## B. Plaintiff's Motion to Amend

As a final matter, the court has examined plaintiff's motion to
amend and finds that it is due to be granted.   Specifically,

---

*But see Hamill v. Wright*, 870 F.2d 1032, 1038 (5th Cir. 1989) (holding that
class protected by § 1985(3) must be characterized by some inherited or immutable
characteristic or by political beliefs or associations); *Rice v. Ohio Department
of Transportation*, 887 F.2d 716 (6th Cir. 1989) (finding that membership in a
"discrete group" necessary to support claim under civil rights conspiracy
statute), *reversed on other grounds*, 497 U.S. 1001, 110 S.Ct. 3232, 111 L.Ed.2d
744 (1990); *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988) (deciding that
"1985(3) extends beyond conspiracies to discriminate against persons based on
race to conspiracies to discriminate against persons based on sex, religion,
ethnicity or political loyalty").

plaintiff moves the court to correct the court's December 7, 1998 order, under the guise of Fed. R. Civ. P. 60(a), and reinstate his claim for prospective relief against defendant Morgan in his official capacity.

In his order entered on March 5, 1996, Judge Haltom properly reserved judgment on plaintiff's claim for prospective relief against defendant Morgan in his official capacity. (*See* Doc. no. 53 at 7.) The Eleventh Amendment does not prohibit a plaintiff from suing state officials in their official capacities for prospective injunctive relief to remedy violations of federal constitutional law. *See Edelman v. Jordan*, 415 U.S. 651, 664-71, 94 S.Ct. 1347, 1356-60, 39 L.Ed.2d 662 (1974) (holding that when a plaintiff sues a state official for violations of federal law, the court may enjoin the official's future conduct, but may not grant retroactive monetary relief that state will pay); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (noting that "a state official sued in his official capacity is a person for purposes of § 1983 when prospective relief, including injunctive relief, is sought"). Therefore, to the extent that this court dismissed plaintiff's claim for prospective relief in its order entered on December 7, 1998, it was in error.

46

## IV.   CONCLUSION

Based on the foregoing, the court finds that defendants' motion for summary judgment is due to be granted with respect to plaintiff's claims bottomed on 42 U.S.C. § 1985, the equal protection clause of the Fourteenth Amendment, and *Pickering*-style freedom of expression, but denied with respect to his *Elrod-Branti* political patronage claims.   The court further finds that plaintiff's motion to amend is due to be granted, and his claim for prospective relief reinstated.   An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _6_ day of March, 2000.

_____
United States District Judge

47